# History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress

## PART II—Invocations of Executive Privilege by Executive Officials

January 27, 1983

## MEMORANDUM FOR THE ATTORNEY GENERAL

This memorandum sets forth examples of two separate but related categories of refusals by officials within the Executive Branch to disclose information or produce documents requested by Congress. The first category, addressed in Section I of this memorandum, comprises instances of refusals by Attorneys General, or other officials in the Department of Justice acting under the Attorney General's authority. Included within this category are general statements by Attorneys General regarding the authority of Executive Branch agencies to withhold information from Congress, as well as instances in which other Executive Branch agencies have withheld information pursuant to the Attorney General's express advice. Section II of this memorandum provides examples of a "separate class"[1] of refusals to provide information, specifically, incidents in which officers of the Executive Branch and the independent agencies have declined to provide information to Congress relating to law enforcement, security, or personnel investigations.

The material contained in this and our December 14, 1982, memorandum,[2] when taken together, demonstrates convincingly that throughout this nation's history, the Chief Executive and those who assist him in "tak[ing] care that the laws be faithfully executed," have on certain occasions exercised their constitutional obligation to refrain from sharing with the Legislative Branch information the confidentiality of which was vital to the proper constitutional functioning of the Executive Branch. As Attorney General, and later Supreme Court Justice, Robert Jackson stated in 1941:

---

[1] Cox, *Executive Privilege*, 122 U Pa. L. Rev. 1383, 1402 (1974).

[2] This memorandum is a supplement to Memorandum for the Attorney General, "Presidential Invocations of Executive Privilege Vis-a-Vis Congress," from Assistant Attorney General Theodore B. Olson, Office of Legal Counsel (Dec. 14, 1982), hereafter "December 14, 1982, Memorandum." [*See* Part I, p. 751, *supra.*]

> Since the beginning of the Government, the executive branch has
> from time to time been confronted with the unpleasant duty of
> declining to furnish to the Congress . . . information which it has
> acquired and which is necessary to it in the administration of
> statutes.[3]

This general principle is neither new nor novel, and represents no departure from
past practice; to the contrary, the assertion of such responsibility has been a
consistent theme throughout our constitutional existence. Moreover, while the
Executive's position at times has been resisted by Congress with varying levels of
intensity, based partially on partisan political considerations, members of the
Legislative Branch have often respected and supported the prerogatives of the
Executive in this regard.[4]

Because this memorandum is intended to be read as a supplement to our
memorandum entitled "Presidential Invocations of Executive Privilege Vis-a-
Vis Congress," *supra,* note 2, it does not include instances of presidential or
presidentially authorized withholdings involving the Attorney General or the
Department of Justice except when a significant statement by the Attorney
General, independent of that made by the President, is involved. Nor does it
discuss in detail instances in which law enforcement files were withheld by the
President or pursuant to his express direction; such instances are noted, however,
with a reference to our December 14, 1982, Memorandum.

While the fundamental principles and rationales underlying the incidents
described here are identical to the principles and rationales underlying formal,
presidential invocations of executive privilege to protect sensitive information
within the Executive Branch, these examples do not represent, in and of them-

---

[3] 40 Op. Att'y Gen. 45, 48 (1941)

[4] Members of Congress in both Houses have on various occasions recognized the authority of Executive Branch
officers to withhold from Congress sensitive investigative materials. For example, in 1906 the Senate was
considering a resolution requesting information from the President concerning the dismissal of three companies of
"colored" Army troops from military service During the debate, Senator John Spooner of Wisconsin raised certain
objections to the form of the resolution In his remarks on the power of the Executive to withhold information,
Senator Spooner gave the following examples of appropriate executive restrictions on disclosures to Congress:

> The Department of Justice would not be expected to transmit to either House the result of its
> investigations upon which someone had been indicted, and lay bare to the defendant the case of the
> Government The confidential investigations in various departments of the Government should be.
> and have always been, treated by both Houses as confidential, and the President is entirely at liberty
> to permit by the Cabinet officer to whom the inquiry is addressed as much or as little information
> regarding them as he might see fit.

3 Hinds' Precedents § 1904, at 197 (1907).

Also, in 1948 six Members of the House, all Democrats and including then Minority Whip John W. McCormack
of Massachusetts, stated as follows with regard to the Attorney General's refusal to disclose Federal Bureau of
Investigation (FBI) investigative files regarding paroles of four federal prisoners, *see generally* pp 790-91 *infra*

> I think the Attorney General is entirely justified in his refusal to make the actual FBI reports available
> to the subcommittee Investigative reports almost inevitably contain much confidential information
> relative to the identity of informants They frequently contain material which must in the interest of a
> successful criminal prosecution be kept confidential until the very moment it is required at the trial.
> The effectiveness and efficiency of the FBI would be greatly impaired if its reports were to be made
> available to any congressional committee which asked for them. Nor do I believe that the consent of
> the Speaker or of the President of the Senate would obviate these difficulties. I may refer in this
> respect to the authoritative opinion of Attorney General Jackson .   . [referring to the Opinion of
> Robert Jackson cited at n.3, *supra*]

H.R Rep No 1595, 80th Cong , 2d Sess. 11 (1948) (Minority Report).

selves, formal invocations of executive privilege.[5] Rather, they exemplify efforts by executive officers to protect the integrity of their files by communicating their concerns to Congress *before* resorting to a formal, presidential assertion of privilege.

The following examples are not intended to be representative of the day-to-day relationship between the Executive Branch and Congress concerning disclosure of information. Many commentators have observed that, as a rule, Congress receives most of the information it seeks, largely because "the several departments and agencies strive to be on good terms with the committees in charge of their appropriations and their legislative programs."[6] Nor does this enumeration constitute a comprehensive listing of every refusal by an executive officer to disclose confidential material to Congress;[7] the compilation of such a list would be an impossible[8]—and largely useless—task to undertake. This memorandum

---

[5] As the doctrine is currently implemented, executive privilege may be formally invoked to prevent disclosures to Congress only by the President personally. Absent such formal invocation, executive officers are obliged to comply with all congressional requests for information in a manner consistent with their duty to execute the law. *See, e.g.*, President Reagan's Memorandum for the Heads of Executive Departments and Agencies. Procedures Governing Responses to Congressional Requests for Information (Nov 4, 1982)

[6] Kramer & Marcuse, *Executive Privilege: A Study of the Period 1953–1960*, 29 Geo. Wash. L Rev. 623, 627 (1961) *See also id.* at 897–98; Bishop, *The Executive's Right of Privacy An Unresolved Constitutional Question*, 66 Yale L.J. 477, 486, 488 (1957); Younger, *Congressional Investigations and Executive Secrecy: A Study in the Separation of Powers*, 20 U. Pitt. L Rev. 755, 770 (1959). For example, in response to a congressional inquiry, the Department of Defense revealed that between May 17, 1954 and May 27, 1957 approximately 300,000 requests for information had been received from Congress by the Department and the military services Of those inquires, only 13 were known by the Department to have been formally denied *Freedom of Information and Secrecy in Government: Hearings on S. 921 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 85th Cong., 2d Sess 385–87 (1958) [hereinafter cited as *1958 Hearings*] (noting, however, that because no records are maintained by the Department specifically recording denials of congressional requests for information, there may have been additional refusals).

[7] In addition to the Dec 14, 1982, Memorandum, *supra*, there are a number of studies which catalogue both formal invocations of executive privilege by Presidents and refusals by other executive officers to disclose information to Congress. They vary widely in scope, accuracy, and completeness *See, e.g.*, Study Prepared by the Government and General Research Division, Library of Congress, The Present Limits of "Executive Privilege," *reprinted in* 119 Cong Rec. 10079 (1973) (listing examples from the period 1960–1972); American Law Division, Library of Congress, Selected Cases in Which Information Has Been Withheld from Congress by the Executive Department, *reprinted in 1958 Hearings, supra*, at 428–46 (covering the period 1789–1956); Memorandum on the Exercise of Executive Privilege, 1956–72, Response to Congressional Inquiry by Deputy Assistant Attorney General Mary C Lawton (Apr. 25, 1973), *reprinted in Availability of Information to Congress Hearings on H.R. 4938, H.R. 5983 and H R. 6438 Before a Subcomm. of the House Comm. on Government Operations*, 93d Cong, 1st Sess. 117–20 (1973); Kramer & Marcuse, *supra*, 29 Geo. Wash. L. Rev. 629, 827, Memorandum Reviewing Inquires by the Legislative Branch During the Period 1948–1953, Concerning the Decisionmaking Process and Documents of the Executive Branch (unpublished, anonymous Department of Justice document) (hereafter Department of Justice Study), Department of Justice study, submitted to the Committee by Deputy Attorney General Rogers, Is a Congressional Committee Entitled to Demand and Receive Information and Papers From the President and the Heads of Departments Which They Deem Confidential, in the Public Interest?, *reprinted in 1958 Hearings, supra*, at 63–146 (hereafter Rogers Memorandum) (covering period from Founders through 1957)

[8] There are countless examples among the boards, agencies, and departments of the Executive Branch wherein congressional staff, Members of Congress, or congressional committees have informally requested information or documents But, as one commentator has noted:

> The actual extent and degree to which the Executive branch responds to [these] congressional requests for information and documents are buried in the files of the several departments, agencies, and congressional committees As a practical matter, it is impossible to sift those records in order to extract from them the portions relating to congressional demands for information and the answers of the Executive pertaining thereto. Only a small part of these inquiries finds its way into the myriad of pages of printed hearings, committee documents and reports, and the Congressional Record. But even here it is virtually impossible to locate them owing to the absence of a proper indexing system.

Kramer & Marcuse, *supra*, at 627.

We know of only one occasion in which a survey has been conducted of the various executive departments'

Continued

instead is designed simply to provide examples of the well-established practice by which executive officers, in carrying out their duty to execute the laws, have declined to provide sensitive material generated within the Executive Branch to Congress.

## I. Attorney General and Department of Justice Refusals[9]

### 1. *1886*

In response to a Senate resolution requesting the Attorney General to transmit to the Senate Committee on the Judiciary copies of all documents and papers filed in the Department of Justice relative to the management and conduct of the Office of the District Attorney (now United States Attorney) for the Southern District of Alabama, Attorney General Garland wrote on January 28, 1886:

> In response to the said resolution the President of the United States directs me to say that the papers which were in this Department relating to the fitness of John D. Burnett, recently nominated to said office, having been already sent to the Judiciary Committee of the Senate, and the papers and documents which are mentioned in the said resolution, and still remaining in the custody of this Department, having exclusive reference to the suspension by the President of George M. Duskin, the late incum-

---

compliance with congressional requests for information. On April 2, 1957, Chairman Hennings of the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary sent letters to the heads of a selected list of executive departments and agencies asking the following questions:

    1 How many times since May 17, 1954, has your agency refused information to Congressmen or congressional committees?

    2. If there have been instances when information has been withheld, when did each occur, and what were the circumstances surrounding such occurrences?

    3 On what basis was the information withheld in each instance?

*1958 Hearings, supra,* at 374. While the answers to Chairman Hennings' letter represent the most complete study concerning the degree to which the Executive Branch as a whole responds to congressional requests for information, the study was limited in scope not only with respect to time—May 1954 through April 1957—but also in terms of the number of agencies polled. In addition, the Hennings study also illustrates the almost insurmountable difficulties in obtaining comprehensive and accurate information on the subject, owing to the inadequacy of records. Typical was the response to Chairman Hennings' letter by Acting Chairman Phillips of the Civil Service Commission:

    The Commission has no way of ascertaining the number of times it has refused information to Congressmen or congressional committees. Our filing system does not lend itself to locating such information. The correspondence file is so voluminous, it would be an insurmountable task to search for such information Inquiries have been made of these [sic] persons in the Commission who would have occasion to entertain a question of refusal, consequently, our answers to your questions are based on memory of such incidents. Undoubtedly, since May 17, 1954, there have been refusals that have escaped the memory of those who were concerned at the time in the determination to furnish the requested information on the specific occasion.

*Id.* at 378. *See also id.* at 385 (response of the Secretary of Defense) ("no special records are maintained by the Department [of Defense] recording denials of congressional requests for information . .   "). *See generally* Kramer & Marcuse, *supra,* at 637 (extensive analysis of Hennings study).

    Notwithstanding these limitations, this memorandum has relied heavily upon the Hennings study and other similar compilations in its effort to document typical instances of executive withholding. *See generally* note 7, *supra* These materials do not provide an adequate basis for obtaining comprehensive or statistically representative examples of executive withholding in the various Administrations

    [9] Although there may well have been instances of refusals by the Attorney General or Department of Justice officials earlier than 1886, such instances have not been well documented. The lack of records regarding incidents prior to this period can be accounted for, in part, by the fact that earlier demands and refusals were handled directly by the President, *see generally* our Dec. 14, 1982, Memorandum, and the fact that the executive departments, including the Department of Justice, were not, for the most part, established until the 1870s

bent of the office of district attorney of the United States for the southern district of Alabama, it is not considered that the public interest will be promoted by a compliance with said resolution and the transmission of the papers and documents therein mentioned to the Senate in executive session.[10]

On February 18, 1886, the Committee on the Judiciary reported a resolution condemning the refusal of the Attorney General to transmit the documents. On March 1, 1886, President Cleveland sent a message to the Senate stating that the requested papers were withheld at his direction because they contained information addressed to him and to the Attorney General by private citizens concerning the former District Attorney, and that the documents related to an act (the suspension and removal of an Executive Branch official) which was a function exclusively within the discretion of the Executive.[11]

## 2. *1904*

On April 27, 1904, Attorney General Knox sent a letter to the Speaker of the House declining to comply with a resolution of the House requesting him, "if not incompatible with the public interest," to inform the House whether any criminal prosecutions had been instituted against individuals involved in the Northern Securities antitrust case, "and to send to the House all papers and documents and other information bearing upon any prosecutions inaugurated or about to be inaugurated in that behalf."[12] The Attorney General responded that no prosecutions had been initiated and that "further than this, I do not deem it compatible with the public interest to comply with the resolution."[13]

## 3. *1908*

In response to a request to transmit, if not incompatible with the public interest, documents and information in the possession of the Department of Justice concerning the International Paper Co. and other corporations engaged in the manufacture of woodpulp or print paper, Attorney General Bonaparte replied on April 13, 1908, that no evidence had been obtained sufficient to justify the institution of legal proceedings, either civil or criminal, against any alleged combination of woodpulp or print paper manufacturers but that a further investigation was in progress. He added that "[i]t would be inexpedient at the present stage of this investigation to disclose to the public specifically what steps have been taken, or what action is contemplated, by this Department with respect to matters mentioned in the said resolution."[14]

---

[10] S. Misc. Doc. 68, 52d Cong., 2d Sess. 236 (1893).

[11] *Id.* at 233, 262–63. *See also* 8 J Richardson, Messages and Papers of the Presidents 375 (1896); December 14, 1982, Memorandum, *supra,* at 23.

[12] 38 Cong. Rec. 5636 (1904). The phrase, "if not incompatible with the public interest," and other, similar phrases have often been embodied in congressional requests for information from the Executive. For a discussion of the origin and use of these congressional formulations, *see generally* Dec. 14, 1982, Memorandum, *supra,* at n.15; 3 Hinds' Precedents, *supra,* §§ 1856, 1896; Cox, *supra,* 122 U. Pa L. Rev. at 1397 and n.55.

[13] H. Doc. No. 704, 58th Cong., 2d Sess. (1904). This refusal was cited by Attorney General Robert Jackson as historical precedent for his opinion at 40 Op. Att'y Gen. 45, 47 (1941), *see infra,* 788–89

[14] H Doc. No. 860, 60th Cong., 1st Sess 1–2 (1908); 42 Cong. Rec. 4512 (1908) *See also* 40 Op. Att'y Gen., *supra,* at 47.

## 4. *1909*

In response to a January 4, 1909, Senate resolution requesting Attorney General Bonaparte to inform it whether legal proceedings had been instituted against the United States Steel Corporation (U.S. Steel) by reason of its absorption of the Tennessee Coal & Iron Company, and, further, to provide any Attorney General opinions written on the subject, President Roosevelt replied on January 6 that he, as the Chief Executive, was responsible for the matter, and that Attorney General Bonaparte had advised him that there were insufficient grounds for instituting legal action against U.S. Steel, and that he had instructed the Attorney General "not to respond to that portion of the resolution which calls for a statement of his reasons for nonaction . . . because I do not conceive it to be within the authority of the Senate to give directions of this character to the head of an executive department, or to demand from him reasons for his action."[15] Thereafter, the Senate Committee on the Judiciary subpoenaed the Commissioner of Corporations to produce all papers and documents in his possession regarding U.S. Steel. The Attorney General advised the Commissioner that the discretion to make the documents public was vested in the President, and that he should therefore call the request to the attention of the President, submit to him the relevant documents and obtain his instructions as to what part of the data, if any, was "suitable for publication by disclosure to the subcommittee of the Senate."[16]

## 5. *1912*

On March 18, 1912, Attorney General Wickersham sent a letter to the Speaker of the House declining to comply with a House resolution directing the Attorney General to furnish to the House information concerning the Department of Justice's investigations of the Smelter Trust.[17]

## 6. *1912*

On March 19, 1912, in response to a Senate resolution requesting the Attorney General to provide it with all correspondence, information, and reports of the Bureau of Corporations relative to the "Harvester Trust," Attorney General Wickersham responded that he was directed by the President to say that it was "not compatible with the public interests" to provide the information at that time because the matters "pertain[ed] entirely to business which is now pending and uncompleted in this department."[18]

## 7. *1912*

In response to a House resolution demanding that the Comptroller of the Currency provide the House Committee on Banking and Currency with data relative to the operation of national banks, Attorney General Wickersham sent an

---

[15] 43 Cong Rec. 528 (1909).

[16] 27 Op Att'y Gen. 150, 156 (1909). *See also* Dec. 14, 1982, Memorandum, *supra.*

[17] *See* 40 Op Att'y Gen., *supra,* at 47.

[18] S Doc. No. 454, 62d Cong., 2d Sess. 1 (1912)

opinion to the President on November 9, 1912, stating that the President, to whom the Comptroller had referred the request, could provide the Committee with the information if, in his opinion, it was proper to do so. The opinion further stated that:

> Nowhere in the law is there any express provision that the information thus acquired by the Comptroller shall be confidential. While, if in your opinion, the interests of the Government require that this information shall be so treated, you have the right to refuse to divulge it, yet, I am clearly of the view that if, in your opinion, it is proper to give this information to the House committee you have the lawful power to do so.[19]

## 8. *1914*

On August 28, 1914, Attorney General McReynolds sent a letter to the Secretary to the President stating that it would be incompatible with the public interest to send to the Senate, in response to its resolution, reports made to the Attorney General by his associates regarding violations of law by the Standard Oil Co.[20]

## 9. *1915*

On February 23, 1915, Attorney General Gregory sent a letter to the President of the Senate declining to comply with a Senate resolution requesting him to report to the Senate his findings and conclusions of the investigations conducted by the Department of Justice "in the matter of illegal combinations in restraint of trade in the smelting industry, commonly called the Smelting Trust," on the ground that to do so would be incompatible with the public interest.[21]

## 10. *1926*

On June 8, 1926, Attorney General Sargent sent a letter to the Chairman of the House Committee on the Judiciary declining to comply with his request to turn over to the Committee all papers in the Department's files relating to the merger of certain oil companies.[22]

## 11. *1941*

In response to a request from the House Committee on Naval Affairs to furnish all Federal Bureau of Investigation (FBI) reports since June 1939, and all future reports, memoranda, and correspondence of the FBI or the Department of Justice in connection with investigations arising out of strikes, subversive activities in connection with labor disputes, or labor disturbances of any kind in industrial

---

[19] 29 Op. Att'y Gen. 555, 560 (1912) (citations omitted).
[20] *See* 40 Op. Att'y Gen , *supra,* at 47.
[21] *See* 52 Cong. Rec. 4089, 4908–09 (1915); *see also* 40 Op Att'y Gen., *supra,* at 48.
[22] *See* 40 Op Att'y Gen., *supra,* at 48.

establishments which had naval contracts, Attorney General Robert Jackson declined, writing on April 30, 1941:

> It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the laws be faithfully executed," and that congressional or public access to them would not be in the public interest.[123]

The Attorney General pointed to the following injurious results which would follow disclosure of the reports: (1) disclosure would seriously prejudice law enforcement; (2) disclosure at that particular time would have prejudiced the national defense; (3) disclosure would seriously prejudice the future usefulness of the Federal Bureau of Investigation, in that the "keeping of faith" with confidential informants was an indispensable condition of future efficiency; (4) disclosure might also result in the grossest kind of injustice to innocent individuals, because the reports included leads and suspicions, sometimes those of malicious or misinformed people, which had not been verified. In addition, he noted that the number of requests alone for FBI records by congressional committees would have made compliance impracticable, particularly since many of the requests were comprehensive in character.

The opinion of the Attorney General was in accord with the conclusions which had been reached by a long line of predecessors, and with the position taken by Presidents since Washington's Administration. He concluded by stating that the exercise of this discretion in the Executive Branch had been upheld and respected by the judiciary.

## 12. *1944*

The House Select Committee to Investigate the Federal Communications Commission subpoenaed the Director of the Federal Bureau of Investigation to testify concerning fingerprint records, activities at Pearl Harbor, and also to identify a certain document which he was alleged to have received in the course of his duties. The Select Committee had been empowered by a House resolution to investigate whether the Commission had been acting in accordance with law and the public interest.[24] The Director refused to give testimony regarding the letter that he was alleged to have received, or to exhibit a copy of the President's directive requiring him, in the interest of national security, to refrain from testifying or disclosing the contents of the Bureau's files. Attorney General Biddle wrote a letter to the Committee, dated January 22, 1944, informing the Committee that communications between the President and the heads of depart-

---

[23] *Id.* at 46. *See also* Dec. 14, 1982, Memorandum, *supra.*

[24] *See* Rogers Memorandum, *supra,* at 97

789

ments were privileged and not subject to inquiry by congressional committees, stating:

> .I have carefully considered the request . . . that I produce before your committee a copy of the document that I received from the President directing Mr. Hoover not to testify before your committee about certain transactions between this Department and the Federal Communications Commission.
>
> It is my view that as a matter of law and of long-established constitutional practice, communications between the President and the Attorney General are confidential and privileged and not subject to inquiry by a committee of one of the Houses of Congress. In this instance, it seems to me that the privilege should not be waived; to do so would be to establish an unfortunate precedent, inconsistent with the position taken by my predecessors.
>
> It could, moreover, open the door to detailed inquiries into the confidential and privileged relationship that exists between the President and the Attorney General, heretofore generally recognized by the Congress. I must therefore respectfully decline to produce before your committee the President's communication. Without waiving in any way the privilege, however, I believe that I can inform the committee that the President's direction states that because the transactions relate to the internal security of the country, it would not be in the public interest, at the present time, for Mr. Hoover or any officer of the Department to testify about them or to disclose any correspondence concerning them.
>
> Furthermore, I should like to point out that a number of . . . questions related to the methods and results of investigations carried on by the Federal Bureau of Investigation. The Department of Justice has consistently taken the position, long acquiesced in by the Congress, that it is not in the public interest to have these matters publicly disclosed. Even in the absence of instructions from the President, therefore, I should have directed Mr. Hoover to refuse to answer these questions.[25]

## 13. *1947*

During the course of an investigation by a subcommittee of the House Committee on Expenditures in the Executive Departments into the operation of the United States Board of Parole in 1947–48, the subcommittee, on September 30, 1947, requested Director Hoover of the Federal Bureau of Investigation, to have a representative of the FBI bring to a hearing the investigative files of four parolees

---

25 *See Study and Investigation of the Federal Communications Commission: Hearings on H. Res 21 Before the House Select Comm. to Investigate the Federal Communications Commission.* 78th Cong , 1st Sess. 2338–39 (1944) *See also* Dec. 14, 1982, Memorandum, *supra*

alleged to be members of the "Capone Mob." Hoover replied that he was forwarding the request to Attorney General Clark to whom the subcommittee reiterated the request.[26] Assistant Attorney General Ford replied on the Attorney General's behalf that the Department would contact the subcommittee after the completion of the FBI investigation. A further reply, by Acting Attorney General Perlman, dated October 15, 1947, stated:

> The substance of your letter is a request that the reports of investigating agencies of the executive departments be made available to your committee. Such reports have long been held to be of a confidential nature.
>
> . . . I feel certain that you can readily see the reasons why we cannot turn over to your committee [the] investigative reports or files you seek . . . .[27]

The subcommittee then sought to reassure the Department that it did not intend at that time to seek "any information as to the confidential sources from which the information was obtained," to which the Department replied that the investigation was not yet complete and referred to the previous letters, again refusing the files. However, the Department did offer summaries of reports and information contained in the file for the subcommittee's confidential use.[28]

## 14. *1948*

The Investigations Subcommittee of the Committee on Expenditures in the Executive Departments requested Attorney General Clark, by letter of August 2, 1948, to furnish the Subcommittee with "any letters, memoranda, or other written notice which the Department of Justice may have furnished to any other departments, agencies, bureaus, or individuals in Government concerning William W. Remington . . . ." The letter stated that the Subcommittee desired the information in order to determine the extent to which other departments within the Executive Branch had been notified of "the possible espionage activities of Remington" so that the Subcommittee would then "be in a position to inquire as to who was responsible for allowing Remington to hold three important jobs of a highly confidential nature, at the same time [that the Department was] conducting an investigation of him."[29]

---

[26] The Seventeenth Intermediate Report of the Committee on Expenditures in the Executive Departments reported on August 6, 1948, that:

> The FBI refused to give the committee any information, assigning as its reason that it was an agency of the Department of Justice and that, acting under instructions from the Department, it could not and would not comply with the request
>
> A request to Tom Clark, head of the Department of Justice, and to the Department of Justice met with a refusal to furnish such information No reason was given other than that the information was confidential and that the refusal was in compliance with an Executive order issued by President Truman, which was based on a long-established policy of the executive departments dating back to the administration of President Washington.

H.R. Rep. No. 2441, 80th Cong., 2d Sess 7 (1948)

[27] *Investigation as to the Manner in Which the United States Board of Parole is Operating and as to Whether There is a Necessity for a Change in Either the Procedure or Basic Law: Hearings Before a Subcomm. of the House Comm. on Expenditures in the Executive Departments,* 80th Cong., 2d Sess 595 (1948).

[28] *Id.* at 594–96. *See also* H.R. Rep No 2441, 80th Cong , 2d Sess 7, 21–23 (1948)

[29] *Export Policy and Loyalty: Hearings on S Res. 189 Before the Investigations Subcomm. of the Senate Comm. on Expenditures in the Executive Departments,* 80th Cong , 2d Sess. 383 (1948).

In his reply of August 5, Attorney General Clark refused to supply the material on the ground that it fell within President Truman's directive of March 13, 1948,[30] and stated that the request had been referred to the Office of the President. A subsequent committee report states that, in addition to the Truman directive, the Attorney General's refusal to supply the information was based on the need to protect . . . information relative to procedures employed by the Department of Justice in the handling of alleged espionage within the Government."[31]

### 15. *1949*

On June 1, 1949, Attorney General Clark failed to comply with a subpoena served upon him by the Subcommittee on Immigration and Naturalization of the Senate Committee on the Judiciary that directed him to produce the files of the Department of Justice in the cases of 168 persons named in the subpoena. In refusing to comply, the Attorney General stated that the persons listed were, for the most part, officials or employees of the United Nations or of foreign governments; that the treatment of persons in that category implicated both sensitive foreign relations considerations and the maintenance of internal security; and that he had conferred with the Director of the FBI and had concluded "'that it is not in the public interest that [this information] be produced.'" The Attorney General further noted that it had been reported in the press that the Subcommittee Chairman intended to "'release certain confidential information contained in [his] files relating to internal security matters.'" The Attorney General urged that before "'such information is made public the matter be cleared with this Department.'" The letter closed by noting that the President had directed the Attorney General to decline to provide this information.[32]

### 16. *1950*

On February 22, 1950, the Senate adopted Resolution 231 directing a subcommittee of the Senate Committee on Foreign Relations, chaired by Senator Tydings, to investigate allegations of disloyalty among Department of State employees, and "'to procure, by subpoena, and examine the complete loyalty and employment files and records of all the Government employees in the Department of State and such other agencies against whom charges have been heard.'"[33]

On March 17, 1950, Attorney General McGrath prepared a memorandum prompted by the Department of State's request for permission to reveal to the subcommittee the contents of the investigative files concerning those employees

---

[30] *Id.* at 384. The Mar. 13, 1948, directive issued by President Truman provided for the confidentiality of all loyalty files by requiring that all requests for such files from sources outside the Executive Branch be referred to the Office of the President for such responses as the President might determine to be appropriate. 13 Fed Reg. 1359 (1948). *See* The Public Papers of the Presidents, Harry S Truman, 1948, at 228; Dec. 14, 1982, Memorandum.

[31] S Rep. No. 1775, 80th Cong , 2d Sess. 20 (1948).

[32] Department of Justice Study, *supra,* at 12–13.

[33] *See* Department of Justice Study, *supra,* at 16. Although this episode is covered in the December 14, 1982, Memorandum, portions of it are recounted in this memorandum to highlight the roles of the Attorney General and the Director of the FBI

against whom Senator McCarthy had made allegations of disloyalty, advising President Truman that, in light of the President's unquestioned authority to withhold the files, the only question was whether, as a matter of policy, he deemed it advisable to make the files available. Referring to the President's March 13, 1948, directive,[34] Attorney General McGrath advised the President that unless there were special reasons which compelled a different course, the confidential nature of the loyalty files should be preserved, and that to do otherwise would create an unfortunate precedent. Attorney General McGrath did suggest, however, that the President could attempt to accommodate the subcommittee's interests by transmitting the files to the Loyalty Review Board with a request that the Board review the files and report its findings with respect to each person against whom charges had been brought, in the light of the factual evidence which had been adduced, primarily by Senator McCarthy, before the subcommittee.[35]

On March 27, 1950, the Director of the Federal Bureau of Investigation and the Attorney General appeared before the subcommittee to give their respective views. The Director's statement dealt with practical objections, while the Attorney General's statement dealt with the historic objections voiced by past Presidents to the disclosure of investigative files. The Attorney General pointed out that since the Department of State loyalty files chiefly involved investigations that had been conducted by the Federal Bureau of Investigation, the "loyalty files, therefore, are for all practical purposes FBI files."[36] The Director's statement stressed the FBI's obligation to protect not only the rights, lives, and property of American citizens, but also to protect the confidential relationship of citizens who serve their country by providing information essential to the national security:

> FBI reports set forth all details secured from a witness. If those details were disclosed, they could become subject to misinterpretation, they could be quoted out of context, or they could be used to thwart truth, distort half truths, and misrepresent facts. The raw material, the allegations, the details of associations and compilation of information in FBI files must be considered as a whole. They are of value to an investigator in the discharge of his duty. These files were never intended to be used in any other manner and the public interest would not be served by the disclosure of their contents.
>
> In taking this stand, I want to reiterate—a principle is involved. I would take this same stand before the Attorney General, as I already have, or before any other body. The fact that I have great respect, confidence, and a desire to be of assistance to a commit-

---

[34] See n.30, supra.

[35] Id. at 13–14.

[36] Id. at 15, citing to the Attorney General's statement before the Subcommittee of the Senate Committee on Foreign Relations at 9 (Mar. 27, 1950).

tee of distinguished Senators, however, in no way detracts from a principle. I say this because I do not want any misinterpretation of my remarks, nor do I want it said that this and other committees of Congress do not have my respect and confidence. I would be derelict to my duty, untrue to my conscience, and unworthy of my trust to take any other position.[37]

On March 28, 1950, the subcommittee served subpoenas on the Secretary of State, the Attorney General, and the Chairman of the Civil Service Commission demanding production of the files. After reference of the subpoenas to the President pursuant to the March 13, 1948, directive, President Truman directed the officials not to comply.[38]

President Truman also wrote to Senator Tydings of the subcommittee on March 28 and reiterated Director Hoover's objections to public disclosure of the FBI reports, stating that the single most important factor in an effective and just loyalty program was the preservation of all files in the strictest confidence, from the points of view of informants as well as innocent individuals. The President closed his letter by stating that in order to give the most thorough and complete investigation of the charges that the subcommittee was considering, he had asked the Chairman of the Loyalty Review Board to have the Board arrange for a detailed review of all cases with regard to which charges of disloyalty had been made. The President further stated that he had asked the Board, after such review, to give him a full and complete report on each case.[39]

Following these events, it appeared that the files had already been disclosed. In 1947, prior to the March 13, 1948, Truman directive, the House Committee on Appropriations had conducted an investigation of the Department of State and had been furnished with the files that were presently sought by the Senate Foreign Relations Subcommittee. In light of this newly discovered fact, President Truman, on May 4, 1950, agreed to make the loyalty files available for review by the subcommittee "on the theory that to do so would not establish a precedent for subsequent exceptions in violation of [the] March 13, 1948, directive."[40] The conditions under which the subcommittee was permitted to see the files included the limitations that no individual cases by name would be discussed outside of the room in the White House where the files were to be viewed, no notes were to be taken from the White House, and no technical assistance by career FBI personnel would be provided to assist in the interpretation of notes found in the files.[41]

## 17. 1952

On March 4, 1952, Assistant Attorney General Duggan wrote to the Chairman of the Special Subcommittee of the House Committee on the Judiciary, in response to a letter dated February 22, 1952, requesting information from the

---

[37] Department of Justice Study, supra, at 16.
[38] The Public Papers of the Presidents, Harry S Truman, 1950, at 240
[39] Department of Justice Study, supra, at 15.
[40] S. Rep. No. 2108, 81st Cong., 2d Sess. 9 (1950)
[41] Department of Justice Study, supra, at 32.

Attorney General "'for the purpose of conducting an inquiry into the administration of the Department of Justice.'" The Subcommittee sought a list of all cases that had been referred to the Department of Justice or United States Attorneys, for either criminal or civil action, by any governmental department or agency within the last six years. The information sought was:

> (a) A list of all cases in which action had been declined by the Department of Justice, including the reasons for refusal to act;
> (b) A statement showing all subsequent actions taken by the Department of Justice in cases in which the Department had returned a case to a government department or agency for further information; and
> (c) A list of cases in which a referral to the Department of Justice had been pending for more than one year, other than the two categories mentioned.[42]

Mr. Duggan responded that the request was outside the scope of the resolution, since it did not seek information based upon specific complaints "supported by credible evidence," and that the request would impose an intolerable burden upon the Department, since it would require an examination of approximately 500,000 cases and thus would effectively paralyze "the Department's efforts to discharge its current duties." Mr. Duggan added that the Department was prepared to honor all reasonable requests with respect to cases in which specific allegations were supported by credible evidence, unless the public interest required otherwise.

On March 5, 1952, Mr. Duggan advised 54 executive agencies, boards, and commissions that he had advised the Subcommittee of his decision not to comply with its request, citing as his reason the fact that "it constitutes what Mr. Justice Holmes has characterized as a 'fishing expedition for the chance that something discreditable might turn up.'"[43]


18. *1952*

On April 22, 1952, Acting Attorney General Perlman wrote the Chief Counsel of the House Subcommittee to Investigate the Department of Justice, in response to five letters sent by the Subcommittee in April 1952 for inspection of Department of Justice files, reiterating the agreement which he and the Subcommittee had reached regarding the production of additional Department of Justice files in aid of the Subcommittee's investigation. That agreement provided for the following:

> 1. Requests involving open cases, either civil or criminal, would not be honored; however, a written or oral status report on the cases would be furnished.

---

[42] *See* Department of Justice Study, *supra*, at 44-46, The Public Papers of the Presidents, Harry S Truman, 1952-53, at 199. President Truman's response to this request is reported in the December 14, 1982, Memorandum, *supra*
[43] Department of Justice Study, *supra*, at 46

2. As to closed cases—cases in which the Department had completed prosecution or consideration without suit—the files would be made available.

3. As to all files made available, Mr. Perlman emphasized that the Department would "withhold from inspection all FBI reports and confidential information, reports of any other investigative agencies, and any other documents containing the names of informers or other data, the disclosure of which would be detrimental to the public interest."

4. Personnel files would never be disclosed, except in cases where Senate committees were considering nominations made by the President.[44]

### 19. *1954*

In response to a request by Republican members of the Special Subcommittee on Investigations of the Senate Committee on Government Operations during the Army-McCarthy hearings for more detailed information about a high-level meeting at the White House to which he had referred in his testimony before the full Subcommittee, the counsel to the Army stated that he had been instructed not to testify as to the interchange of views among the officials present at that meeting. In response to a request to submit written authorization for the position that he had taken, the counsel to the Army submitted the May 17, 1954, Eisenhower letter[45] to which was attached a memorandum from Attorney General Brownell. Attorney General Brownell's memorandum listed historical examples of instances in which Presidents had withheld information from Congress and concluded that:

> Thus, you can see that the Presidents of the United States have withheld information of executive departments or agencies whenever it was found that the information sought was confidential or that its disclosure would be incompatible with the public interest or jeopardize the safety of the Nation. The courts, too, have held that the question whether the production of the papers was contrary to the public interest, was a matter for the Executive to determine.
>
> By keeping the lines which separate and divide the three great branches of our Government clearly defined, no one branch has been able to encroach upon the powers of the other.[46]

### 20. *1955–1956*

In a letter from Chairman O'Mahoney to Chairman Hennings, whose subcommittee was separately conducting a study of Executive Branch refusals to provide information to Senate committees,[47] Chairman O'Mahoney wrote:

---

[44] *Id.* at 46–47

[45] *Reprinted in* Dec 14, 1982, Memorandum.

[46] *Special Senate Investigation on Charges and Countercharges Involving: Secretary of the Army Robert T. Stevens, et al.: Hearings on S Res. 189 Before the Special Subcomm. on Investigations of the Senate Comm. on Government Operations,* 83d Cong , 2d Sess. 1269–75 (1954).

[47] *See generally 1958 Hearings, supra*

The Department of Justice has declined to furnish to this [S]ubcommittee [on Antitrust and Monopoly] information in its files which was furnished by companies in connection with its voluntary merger clearance program on the ground that information so supplied is confidential.

The Department of Justice has consistently refused to permit the [S]ubcommittee to examine grand-jury transcript[s] and documents obtained pursuant to grand-jury subpena[es] which have not become matters of public record. In accordance with long-standing policy, the Department has refused to permit examination of Federal Bureau of Investigation reports.[48]

## 21. *1955*

On June 15, 1955, Attorney General Brownell sent an opinion to the President advising him that the Federal Communications Commission could, in its discretion, provide the Senate Committee on Interstate and Foreign Commerce information that the Commission had received on a confidential basis from television stations and networks.[49] However, the Attorney General advised, the authorization to disclose the information did not constitute a requirement that the Commission divulge to the Committee confidential information, and, that the Commission was free to withhold that information in its discretion.

## 22. *1955*

Within the context of the July 1955 hearings on the Dixon-Yates Contract before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary,[50] Attorney General Brownell advised the Chairman of the Securities and Exchange Commission (SEC) that:

Any communication within the SEC among Commissioners or the Commissioners and employees is privileged and need not be disclosed outside of the Agency. Likewise, any communication from others of the executive branch to members of the Commission or its employees with respect to administrative matters comes within the purview of the President's letter of May 17, 1954.

You inquired specifically whether when a proceeding is pending before the Commission a request to the Commission for an adjournment by someone in the executive branch outside the Commission is likewise covered. Because such a proceeding is quasi-judicial in nature, it is my opinion that such a request would not be covered by the President's letter . . . . Once the proceeding is no longer pending before the Commission such information

---

[48] *Id.* at 352.
[49] 41 Op. Att'y Gen. 221 (1955)
[50] *See generally* Kramer & Marcuse, *supra*, 29 Geo. Wash. Rev. at 689, Dec. 14, 1982, Memorandum, *supra.*

should, upon request, be made available by the Commission to an appropriate congressional committee.[51]

However, when subsequently questioned about a telephone conversation that he had had with Presidential Assistant Adams, the Chairman of the SEC testified as to the existence of the conversation but, on the advice of Attorney General Brownell and of Special Counsel to the President Morgan, he refused to divulge the matters discussed during the conversation on the ground that they involved privileged information.[52]

### 23. 1956

On May 29, 1956, during the course of its investigations into the Antitrust Consent Decree Program at the Department of Justice, the Antitrust Subcommittee of the House Committee on the Judiciary requested the Department to furnish it with "all files in the Department of Justice relating to the negotiations for, and signing of, a consent decree" in the A.T.&T. case.[53] The Department of Justice replied on July 13, 1956:

> The staff of the Antitrust Division has examined in detail this Department's files relating to the negotiations and formulation of that decree. The bulk of these documents fall[s] in[to] two categories: first, material submitted by defendants regarding their operations; and, second, memoranda by various members of the Antitrust Division concerning negotiation conferences as well as decree provisions.
>
> Documents relating to defendants' operations . . . were produced, not pursuant to interrogatories or court order, but rather in the course of good-faith negotiation of a consent settlement. Some touched on confidential aspects of the defendants' operations. Were they made available to your subcommittee, this Department would violate the confidential nature of settlement negotiations and, in the process, discourage defendants, present and future, from entering into such negotiations.
>
> In any event, . . . Department policy does not permit disclosure of staff memoranda or recommendations. As I indicated, the decision whether or not to settle, and if so on what terms, may involve difficult judgments. Reaching these judgments, I am sure you appreciate that men equally devoted to vigorous antitrust enforcement may well differ. To [ensure that] intelligent final decision[s are made] therefore, full and open discussion is re-

---

[51] *1958 Hearings, supra,* at 445–46, *citing* The New York Times, July 15, 1955, at 1

[52] *See 1958 Hearings, supra,* at 446

[53] Kramer & Marcuse, *supra,* 29 Geo. Wash. L Rev. at 887. *See Consent Decree Program of the Department of Justice: Hearings Before the Antitrust Subcomm. of the House Comm. on the Judiciary,* 85th Cong , 1st and 2d Sess., (Pts I & II) (1957–58); Report on H. R. Res 27 of the Antitrust Subcomm. of the House Comm. on the Judiciary, 86th Cong., 1st Sess. (1959)

quired frequently, not only by all members of the staff but also by the staff with the Assistant Attorney General. This process of interchange may endure over some time. And, as a result of discussion, any participant must feel free to alter his views as the merits of argument dictate. This essential process of full and flexible exchange might be seriously endangered were staff members hampered by the knowledge they might at some later date be forced to explain before Congress intermediate positions taken. The responsibility for explaining such decisions thus rests upon the Assistant Attorney General and ultimately upon the Attorney General.[54]

However, the Subcommittee report indicates that the Subcommittee was able to get much of the information that it had requested voluntarily from A.T.&T., the Department of Defense, and the Federal Communications Commission.[55]

24. *1957*

On April 18, 1957, the Antitrust Subcommittee of the House Committee on the Judiciary, again investigating the Department's enforcement efforts in the Consent Decree Program, sought correspondence between the Department and some of the oil pipelines, departmental drafts, and intradepartmental memoranda, including a factual summary of the results of an FBI investigation into compliance with the oil pipeline consent decree. On April 22, 1957, the Department responded that the documents would not be turned over to the Subcommittee because they

reflect almost completely either staff recommendations or differences in view. Should we decide some court action is called for, releasing those documents . . . could seriously prejudice any resulting litigation. Immediately clear is the disadvantage that would stem from revealing differences in staff views or investigative reports that could form the basis of any action in court.[56]

On July 12, 1957, the Subcommittee requested copies of all written interpretations, and an explanatory statement of each official oral interpretation that had been made, of the various provisions of the judgment, as well as a statement that would summarize the factual results of the FBI investigations which had been instituted to determine compliance with the consent decree. The Department again declined, taking the position that:

The Department is currently considering possible enforcement steps which involve these interpretations. Many of these so-called interpretations were little more than expressions of opinions as to

[54] *Id* at 887–88
[55] *Id* at 891.
[56] *Id* at 884.

the position that the Department might take if and when certain events were to occur. All were confined solely to specific individuals and at times unique problems. And the Department might well urge that these prior interpretations had no bearing on any particular enforcement move—contemplated now or in the future. Accordingly, to disclose such interpretations now, I believe, might complicate enforcement of the above judgment.[57]

The FBI summaries were also refused, on the ground that even the summaries would divulge information given to agents in confidence.

During the subsequent hearings on the same subject, Assistant Attorney General Hansen further explained the Department's refusal to provide the Subcommittee with the requested information, noting that because enforcement proceedings were pending, "we should prejudice the possible interests of the Government by disclosing opinions that might be read out of context" and "that such disclosure . . . would be exceedingly embarrassing."[58] Congressman Keating, a member of the Subcommittee, supported the Assistant Attorney General, agreeing that opponents' counsel would be most interested in learning which points of its case the government considered strong and of which aspects it was less confident.[59]

Chairman Celler then told the Assistant Attorney General that some of the information sought by the Subcommitee had already been made available to it from the files of various defendants. In response, the Assistant Attorney General explained that some letters had been sent to defendants containing staff recommendations but that such information was not intended to be shared among defendants, but rather to be used exclusively by the addressees themselves.[60]

### 25. 1960

On December 19, 1960, Attorney General William P. Rogers issued an opinion to the President advising him that a construction of a provision of the Mutual Security Act of 1954 that would require funds for the Office of the Inspector General and Comptroller to be cut off for failure to supply documents upon the request of appropriate congressional committees and subcommittees, notwithstanding a certification by the President that he had forbidden the production of the requested documents for certain specified reasons, would render the proviso unconstitutional as a violation of the separation of powers:

It is axiomatic that no democratic society can exist unless each of its branches makes every effort to disclose to the citizenry and the other branches of the Government those facts which are relevant to an understanding of the problems the society faces, the steps which have been taken to meet them, and the operations of

[57] *Id.* at 885.
[58] *Id*
[59] *Id.*
[60] *Id.* at 885–86.

the branch involved. Public policy therefore requires disclosure wherever possible. Nevertheless, under certain circumstances disclosure must be withheld in the public interest, and the principles expressed above may be summed up and applied as follows:

First, it is the constitutional duty and right of the President and those officials acting pursuant to his instructions, to withhold information of the executive branch from Congress whenever the President determines that it is not in the public interest to disclose such information.

Second, under the constitutional doctrine of separation of powers Congress may not directly encroach upon this authority confided to the President.

Third, the Constitution does not permit any indirect encroachment by Congress upon this authority of the President through resort to conditions attached to appropriations such as are contended to be contained in section 553A(d) of the act.

In my opinion, this condition on the use of appropriations . . . [would] not only be plainly invalid, but if adopted in this case would also constitute a most dangerous precedent to the Office of the President, and would gravely impair the proper functioning and administration of the executive branch of the Government.[61]

## 26. *1969*

During a House Committee investigation into the My Lai massacre, Congressman Rivers requested "all reports, affidavits, photographs and all other pertinent documents, and material which may have any probitive value" concerning the Army's ongoing investigation into the incident. Thomas Kauper, Deputy Assistant Attorney General, Office of Legal Counsel, gave the Department of Justice's approval of a proposed letter to Congressman Rivers from Secretary of the Army Resor, which explained why this material could not be disclosed. Mr. Kauper stated as follows:

Over a number of years, a number of reasons have been advanced for the traditional refusal of the Executive to supply Congress with information from open investigational files. Most important, the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressure will influence the course of the investigation. The My Lai investigations clearly represent such a danger.[62]

---

[61] 41 Op. Att'y Gen 507, 529–30 (1960) (footnote omitted).

[62] Memorandum for Honorable Edward L. Morgan, Deputy Counsel to the President, from Thomas E. Kauper, Deputy Assistant Attorney General, Office of Legal Counsel (Dec 19, 1969), at 2.

## 27. *1970*

On November 21, 1970, Attorney General Mitchell, with the specific approval of the President, refused to release certain investigative files of the FBI to the Subcommittee on Intergovernmental Relations of the House Committee on Governmental Relations that contained information regarding certain scientists nominated by the President to serve on advisory boards of the Department of Health, Education and Welfare.[63]

## 28. *1975*

On January 31, 1976, Chairwoman Abzug of the Subcommittee on Government Information and Individual Rights of the House Committee on Government Operations requested interview statements and investigative reports concerning domestic intelligence matters from the open files of the Federal Bureau of Investigation. On February 26, 1976, Deputy Attorney General Harold R. Tyler, Jr., wrote Chairwoman Abzug, explaining why these documents could not be disclosed to the Subcommittee:

> First, the Executive Branch must make a strong effort to protect innocent individuals. Disclosure of investigative files and reports, which often contain hearsay and inaccurate information, could do irreparable damage to the reputation of innocent individuals.
>
>     *        *        *        *        *
>
> Second, if the Department changes its policy and discloses investigative information, we could do serious damage to the Department's ability to prosecute prospective defendants and to the FBI's ability to detect and investigate violations of federal criminal laws.
>
>     *        *        *        *        *
>
> Third, the detection, and investigation of violations of federal criminal laws and the prosecution of individuals alleged to have committed such violations are Executive functions. The Attorney General, serving as the President's chief law enforcement officer, is under the same constitutional duty as the President to "take care [that] the laws be faithfully executed." U.S. Const. Art. II, § 3. That duty encompasses the responsibility to maintain the Separation of Powers so basic to our government.

## 29. *1979*

In response to a request from Chairman Baucus of the Subcommittee on Limitations of Contracted and Delegated Authority of the Senate Committee on the Judiciary for a substantial number of documents from FBI files and other files

---

[63] Memorandum for Chairman Moorhead, Subcommittee on Foreign Operations and Government Information of the House Committee on Government Operations, from Deputy Assistant Attorney General Lawton, Office of Legal Counsel (Apr. 25, 1973) *See also* Dec. 14, 1982, Memorandum, *supra.*

located within the Department, to assist the Subcommittee in its oversight investigation into certain sales by the General Services Administration, Deputy Assistant Attorney General Heckman stated:

> The Department has agreed to give the Subcommittee staff limited access to these internal memoranda [2 closed files on titanium and lithium sales proposed by the General Services Administration]. Our policy with regard to providing Congressional Committees with analytical, strategy or deliberative portions of memorandum[s] related to these investigations is to make them available at the Department for review and analysis, including notetaking. The substantive information in these memoranda may be used for Subcommittee purposes. The memoranda themselves, however, will be retained in the Department and copies will not be provided.[64]

The July 27, 1979, letter from Chairman Baucus to Attorney General Civiletti refining the Subcommittee's request for documents indicated that its earlier requests for material from open investigative files on term contractors was denied "because they are directly related to active investigations and prosecutions."[65]

## 30. *1980*

On March 14, 1980, Chairman Edwards of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary requested from Attorney General Civiletti a copy of the report prepared by the Rowe Task Force concerning the involvement of an FBI informant in the murder of Mrs. Viola Liuzzo in Alabama. On March 31, 1980, Michael Shaheen, Jr., Counsel, Office of Professional Responsibility, Department of Justice, wrote Chairman Edwards as follows:

> The [Rowe] report is still being reviewed within the Department and several issues affecting its release outside the Department are still being studied. Certain promises of confidentiality were necessary before some individuals would cooperate with Task Force members and those promises must be honored. Moreover, the State of Alabama's indictment of Mr. Rowe for the murder of Mrs. Viola Liuzzo is still pending and it is our opinion that any release of the report in its current form could seriously prejudice both Alabama's and Mr. Rowe's right to a fair trial.
>
> For these and other related reasons, it is not possible for the Department to furnish to you a copy of the report in its present form at this time.[66]

---

[64] Aug 20, 1979, letter from Deputy Assistant Attorney General Heckman to Chairman Baucus

[65] July 27, 1979, letter from Chairman Baucus to Attorney General Civiletti.

[66] *Cf. Playboy Enterprises, Inc.* v *Dep't of Justice,* 677 F.2d 931 (D C Cir 1982) (upholding the Department's claim of privilege pursuant to a request under the Freedom of Information Act, 5 U S C § 552, for those parts of the Rowe Report which fell within the Act's exemption for "investigatory records compiled for law enforcement purposes," § 552(b)(7), but rejecting the Department's claim that the whole Report was protected from disclosure by Exemption 5's "deliberative process" privilege, § 552(b)(5)).

### 31. *1982*

On November 5, 1982, Assistant Attorney General Olson advised the General Counsel to the Department of Transportation that a provision of the Tax Equity and Fiscal Responsibility Act of 1982, which requires the Administrator of the Federal Aviation Administration to transmit certain budget information and legislative recommendations to Congress at the same time that they are transmitted to the Secretary of Transportation, the President, or the Office of Management and Budget would, if interpreted literally, violate the constitutional principle of separation of powers.[67]

## II.
### Refusals by Independent Agencies and Executive Departments Other Than the Department of Justice to Disclose Information to Congress Concerning Law Enforcement, Security, and Personnel Investigations[68]

This Section II lists some of the many instances wherein independent agency heads and sub-presidential executive officers (outside the Department of Justice) have declined to provide sensitive investigative information requested by Congress. This Section does not describe those instances in which Presidents personally have ordered the withholding of investigative information;[69] nor does it discuss those examples of Department of Justice withholdings of investigative information enumerated in Section I of this memorandum.[70]

It should be noted that, like Section I, this Section relies heavily upon published studies which discuss particular executive agencies' responses to congressional requests for information during certain Administrations. Because these studies focus upon congressional–executive relationships at particular times in our history, they cannot be used to develop comprehensive statistics on, or statistically representative examples of, executive withholdings of information generally.[71] It is possible, however, to infer from these studies that similar episodes of withholding of sensitive information have occurred throughout

---

[67] On Feb 21, 1977, Assistant Attorney General Harmon, Office of Legal Counsel, advised the Attorney General that a bill that would require inspectors general in the executive departments to report directly to Congress information regarding their investigations without prior clearance or approval by the head of the department involved would be unconstitutional. That memorandum stated. "The constitutional principle of executive privilege must be preserved. The provision in the bill requiring reports to Congress of all 'flagrant abuses or deficiencies' within 7 days after discovery would risk jeopardizing ongoing investigations by the agency and the Justice Department, many of which would be subject to a claim of privilege." 1 Op. O.L.C 16, 18–19 (1977).

[68] Congressional requests for information from sub-presidential executive officers have a long history. A number of such requests occurring in the 19th century are discussed in 3 Hinds' Precedents, *supra*, §§ 1856–1910. *See, e.g.*, H.R Rep. No. 194, 24th Cong , 2d Sess. 4, 6–7 (1837), House Journal, 16th Cong , 2d Sess. 67, 70 (1820), House Journal, 14th Cong., 1st Sess. 92, 201, 206, 262 (1815); House Journal, 9th Cong., 2d Sess. 533–36 (1807); House Journal, 4th Cong , 2d Sess. 634 (1796). *See also* Act of Sept. 2, 1789, ch. 12, § 2, 1 Stat 65 (Secretary of Treasury must provide certain information to Congress upon request). It is unclear from these sources, however, how frequently such officers declined to comply with congressional requests.

[69] *See, e.g ,* Dec. 14, 1982, Memorandum, *supra,* at paras. 4 (President Monroe); 5 (President Jackson); 6 (President Tyler); 9 (President Buchanan); 10 (President Lincoln); 11 (President Johnson); 13 (President Cleveland); 17 (President Theodore Roosevelt); 18 (President Coolidge); 20 (President Franklin Roosevelt); 21, C (President Truman), 25 (President Nixon).

[70] *See, e.g.,* Section I, paras. 1 (also discussed in December 14, 1982, Memorandum, *supra,* at para 13); 2–6, 8–16, 18, 20, 23, 24, 26–30

[71] *See* notes 6–8, *supra.*

American history. The following incidents have been selected only to provide some illustration of the well-established practice wherein Executive officers have protected their sensitive investigative files from disclosure to Congress.

### 1. *1846–47*

On December 8, 1846, the House of Representatives by resolution directed the Secretary of the Treasury to supply it with information concerning secret inspectors who had been hired by the Department of the Treasury for customs enforcement. On February 8, 1847, the Secretary declined to reveal the names of the secret agents and inspectors, deeming it "inexpedient" to do so.[72] During a subsequent House debate on a further resolution to require the information from the Secretary, it was pointed out by Rep. Bayly that "[t]he intention in employing [the agents] is to prevent smuggling; but if their names were made public, the very design of their employment would be frustrated."[73] The debate concluded with no further attempt to obtain the information.

### 2. *1861*

On December 2, 1861, the House adopted a resolution requesting the Secretary of War, "if not incompatible with the public interest," to report to the House what measures were taken to investigate "who is responsible for the disastrous movement of our troops at Balls Bluff."[74] The Secretary of War declined to comply in a letter dated December 12, 1861.[75] On January 6, 1862, the House responded with a resolution "that the [Secretary's] answer is not responsive nor satisfactory to the House, and that the Secretary be directed to return a further answer."[76]

On January 10, 1862, the Secretary responded to the second resolution of the House, stating, "measures have been taken to ascertain who is responsible for the disastrous movement of our troops at Balls Bluff, but . . . it is not deemed compatible with the public interest to make known those measures at the present time."[77]

### 3. *1932*

In responding to a request from the House of Representatives for all documents pertaining to an investigation of the importation of ammonium sulfate, the Secretary of the Treasury stated:

---

[72] 17 Cong. Globe, 29th Cong., 2d Sess. 400 (1847); *see id.* at 355.

[73] *Id.* at 401.

[74] 3 Hinds' Precedents, *supra*, at § 1886. Although the Battle of Balls Bluff on Oct. 21, 1861, represented a militarily inconsequential defeat for Union troops early in the Civil War, it aroused Radical Republicans in Congress against General-in-Chief George B. McClellan, a Democrat. McClellan subsequently arrested General C.P. Stone for responsibility in the defeat, but no formal charges were filed against him, and General Stone was released within six months The Battle's chief military effect was to delay Union Army movements against Richmond, Virginia. *See generally* 1 *Dictionary of American History* 150 (J. Adams ed. 1940).

[75] 3 Hinds' Precedents, *supra*, at § 1891

[76] *Id.* at § 1886.

[77] *Id*

In passing the antidumping act the Congress decided to provide that the initial decisions as to the existence of dumping should be made by the Secretary of the Treasury in accordance with administrative procedure. It has been the practice of the department in acting under this statute to treat all information furnished by interested persons as confidential and not to disclose it unless such persons consent to the disclosure. This practice is founded upon the necessity for the department to obtain complete information concerning manufacturers' and importers' business transactions which it would be practically impossible to obtain if those furnishing the information did not understand it would be treated as confidential and not divulged without their consent.

As consent has not been given to the disclosure of the information contained in the record before the Treasury Department, I am of the opinion that it would be incompatible with the public interest to comply with the request contained in the resolution.[78]

## 4. *1948*

A subpoena issued by the Subcommittee on Immigration and Naturalization of the Senate Committee on the Judiciary directed Assistant Secretary of State Peurifoy to provide investigative files of the Department of State concerning over 160 persons named in the subpoena. In response, the Acting Secretary of State wrote the Committee that disclosure of the materials would be contrary to the public interest and detrimental to the conduct of the foreign relations of the United States. Disclosure of the material, the letter stated, would hamper future work of our diplomatic and consular missions abroad and place many sources "in personal jeopardy." The Acting Secretary referred, *inter alia*, to the April 1941 Opinion of Attorney General Robert Jackson[79] as authority for his refusal, and stated in closing that the President had given specific approval for the denial.[80]

## 5. *1955*

On October 18, 1955, the Subcommittee on Securities of the Senate Committee on Banking and Currency requested the Securities and Exchange Commission to make available to the Subcommittee the investigative files on two separate matters. On November 10, Chairman Armstrong responded by stating, with regard to the first matter,

this investigation is still open and in progress. It has been the consistent policy of the Commission not to release its pending investigation files. It has been our belief that such release might impair the integrity of the Commission's investigative process and

---

[78] 75 Cong. Rec. 11669 (1932). *See generally* Wolkinson, *Demands of Congressional Committees for Executive Papers*, 10 Fed. Bar J. 103, 133–34 (1949)
[79] 40 Op. Att'y Gen. 45 (1941).
[80] Department of Justice Study, *supra*, at 11–12

seriously interfere with the Commission's responsibility of appro-
priate enforcement action, in case this becomes necessary . . . .
We do not at present know what information [the Committee staff]
would desire on this subject but it may well be that we can provide
. . . sufficient material in the form of summaries or otherwise to
meet [their] needs. A similar procedure was followed this spring
in connection with information about certain investigations which
was desired by your Committee in connection with certain phases
of the stock market study with mutually satisfactory results.[81]

With respect to the second investigation, the Chairman wrote,

[s]ince this matter is still in litigation, it is the Commission's view,
with which I am sure you will agree, that it would be inappropri-
ate to disclose those files or discuss this case outside the court.
Immediately upon the termination of the litigation, we will, of
course, welcome your Committee's review of our files.[82]

## 6. *1955*

The General Services Administration (GSA) had turned over to the Depart-
ment of Justice certain copies of insurance files of the Snare-Merritt Corporation,
a government contractor, for investigation. The GSA subsequently declined to
make these documents available to the Special Government Activities Subcom-
mittee of the House Committee on Government Operations on the ground that
once copies of the documents had been transferred to the Department of Justice
for investigation, those files became subject to the control of the latter Depart-
ment.[83] A similar demand for these documents was also made upon the Depart-
ment of Justice, which refused to disclose them, apparently on the ground that
they referred to a pending investigation.[84] Subsequently, however, the material
became available to the House through an undisclosed source, and this appar-
ently mooted the controversy.[85]

## 7. *1955*

Rep. Bennett, of the Subcommittee on Commerce and Finance of the House
Committee on Interstate and Foreign Commerce, requested information from the
current investigative files of the Securities and Exchange Commission regarding
"spectacular" examples of fraud, together with the names of companies and
principals involved, which the Subcommittee could "expose" at its hearings. On
November 4, 1955, SEC Chairman Armstrong advised Rep. Bennett as follows:

[81] *1958 Hearings, supra,* at 297.

[82] *Id.* at 298.

[83] *See* H.R Rep. No 2390, 84th Cong , 2d Sess. 16 (1956).

[84] *Id.* at 17 (the House Report states, "[t]he Justice Department has furnished no reasonable explanation for
denying the subcommittee access to [this information]")

[85] The New York Times, Oct 19, 1956, at 17, col. 3. *See generally* Kramer & Marcuse, *supra,* at 643–44

The requested information concerns material contained in the pending investigation files of the Commission. These are not public at the present time. For the Commission to release such information in our pending investigation files for use in a public hearing of a congressional committee before our investigation has been completed might prejudice the prosecution of the matters in the event that the cases might later be referred to the Department of Justice for a criminal prosecution, and might destroy the value of any civil or administrative remedies that might be instituted by the Commission and the parties in the particular cases. Also, if testimony and statements elicted [sic] from witnesses on the understanding that the Commission would treat the information as confidential, were made public, the ability of the Commission to obtain the cooperation of the public in our investigations of violations of the Securities Acts would have the opposite effect which you so correctly say is the joint objective of your commit-tee . . . and our Commission . . . .[86]

### 8. *1955*

During an investigation by the Senate Committee on Post Office and Civil Service concerning the administration of the Federal Employees' Security Pro-gram, a subpoena was issued to the Chairman of the Civil Service Commission requesting him to produce, on July 28, 1955, "all files, correspondence, docu-ments, records, etc., in the possession of the Civil Service Commission" relating to three named individuals. The Chairman provided the Committee with certain material relating to the persons mentioned in the subpoena, but withheld portions of the files which concerned investigative matters, as well as internal advice and communications on official matters on the ground that such material was covered under President Eisenhower's letter of May 17, 1954.[87]

### 9. *1955*

On March 22, 1955, a Senator requested information in the files of the Civil Service Commission concerning certain named former federal employees. The Senator asked specifically "whether or not there is anything in the files of the following individuals which would be interpreted as of sufficient detrimental nature to prohibit their reemployment by the United States Government." The Commission declined to make this information available, stating: "The Commis-sion cannot prejudice the material in a file of an individual who is not now before it for a determination as to eligibility for employment. If and when any of the persons mentioned in your letter again apply for Federal employment, the then existing applicable rules and determination as to eligibility will be adhered to and a determination made accordingly."[88]

---

[86] *1958 Hearings, supra,* at 416.

[87] *1958 Hearings, supra,* at 378; Kramer & Marcuse, *supra,* at 652 The President's instruction is discussed in the December 14, 1982, Memorandum.

[88] *1958 Hearings, supra,* at 378.

## 10. *1955*

On October 13, 1955, the Chief Clerk of the House Committee on Un-American Activities requested that he, or an investigator of the Committee, be allowed to examine the Commission's confidential files. The Commission denied the request "because in many instances the files contain information of a confidential and investigative nature that can be made available only to those officials in the executive branch of the government who have need for the information in the performance of their official duties."[89]


## 11. through 18. *1955–1957*

In response to Chairman Hennings' request for an enumeration of refusals to supply Congress with information, *see* note 8, *supra,* the Department of Defense listed, *inter alia,* the following eight instances that concerned its investigative files:[90]

February 8, 1955: Upon the request of Senator McClellan, Chairman, Senate Permanent Investigations Subcommittee, for an inspector general's report on Irving Peress, the Army submitted a detailed summary of all actions taken by the Army in the Peress case. The inspector general's report itself was withheld, pursuant to the Department's responsibility to safeguard (1) information revealing investigative techniques, (2) information as to the identity of confidential informants and information furnished by them in confidence, (3) incomplete information which might unjustly discredit an innocent person, and (4) intra-departmental communications of an advisory and preliminary nature.[91]

September 2–6, 1955: The Army denied the requests of the House Appropriations Committee for inspector general's reports and auditor general's reports pursuant to the Department's responsibility to safeguard information in investigative reports for the reasons stated above. In lieu of the investigative reports, the Army furnished, as requested, detailed summaries of all actions taken in connection with the contracts under investigation.

September 16, 1955: The Air Force denied the request of Senator Johnson, Chairman, Senate Preparedness Investigating Subcommittee, for material derived from an inspector general's report, pursuant to the Department's responsibility to safeguard information in investigative reports.

January 17, 1956: The Air Force denied the request of Senator Magnuson, Chairman, Senate Committee on Interstate and Foreign Commerce, for information concerning the discharge of a serviceman, pursuant to the Department's responsibility not to release an individual's personnel records without his consent so as not to unjustly or unnecessarily discredit him or disclose information received in confidence.

---

[89] *Id.* at 379.

[90] *Id.* at 385–87.

[91] Background concerning the congressional investigation of the promotion and discharge of Major Irving Peress may be found in *Army Personnel Actions Relating to Irving Peress· Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Government Operations,* 84th Cong., 1st Sess. (1955), Kramer & Marcuse, *supra,* at 687–89.

February 2, 1956: The Air Force denied the request of the House Appropria tions Committee for inspector general's reports and auditor general's reports pursuant to the Department's responsibility to safeguard information contained in investigative reports.

*     *     *     *     *

January 12, 1957: The Army denied the request of Congressman Moss, Chairman, House Subcommittee on Public Information, for an investigative file compiled in connection with charges of disloyalty and subversion at the Signal Corps Intelligence Agency, pursuant to the Department's responsibility to safe- guard investigative reports.

January 25, 1957: The Air Force denied the request of Congressman Murray, Chairman, House Committee on Post Office and Civil Service, for an inspector general report concerning employment conditions at Okinawa, pursuant to the Department's responsibility to safeguard investigative reports. However, the Subcommittee was furnished a summary of the findings contained in the report.

*     *     *     *     *

April 13, 1957: The Defense Department denied the request of Congressman Moss, Chairman, House Subcommittee on Public Information, for investigative memoranda and a report of conversations between the Department and newsmen, pursuant to the Department's responsibility to safeguard investigative reports and information received in confidence.

19. *1956*

An individual congressman (not a committee chairman) requested material from the files of the Housing and Home Finance Agency concerning certain housing project contracts which were related to a private bill he had introduced. On March 28, 1956, the Agency advised the congressman that it would not disclose the information because there was a pending lawsuit in the Court of Claims seeking judicially the same relief as that covered by the congressman's bill. Since the litigation was being conducted by the Department of Justice, the Agency deemed it "inappropriate" to provide the requested information.[92]

20. *1962*

On May 2, 1962, Chairman Fountain of the House Government Operations Subcommittee requested access to the investigative files of the Food and Drug Administration concerning the drugs MER-29 and Flexin. Commissioner Larrich declined to make the files available, stating that his agency had "uniformly declined to make files on new drugs available" to Congress, in order to encour- age manufacturers to make as complete a disclosure as possible when they file new drug applications.[93]

21. *1971*

During an investigation by the Subcommittee on Constitutional Rights of the Senate Judiciary Committee concerning information gathering by the military

---

[92] *1958 Hearings, supra,* at 403–04.

[93] The New York Times, June 21, 1962, at 17, col. 1.

810

with regard to possible civil disturbances, Chairman Ervin requested access to an Army investigative report on the 113th Intelligence Group. In response, on April 19, 1971, Secretary of Defense Laird wrote the Chairman as follows:

> it is the policy of the Executive Branch not to divulge the contents of investigations while an investigation is still open and prior to final action being taken. As the testimony taken . . . may possibly provide the basis for disciplinary action, it would be inappropriate to authorize the release of these documents. To do so might jeopardize the rights of the people involved and prevent them from being afforded a fair hearing.[94]

### 22. *1972*

On August 15, 1972, Senator Kennedy, Chairman of the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, requested from the Securities and Exchange Commission "documents, statements, and other materials" relating to the Commission's stock trading investigation of the International Telephone and Telegraph Corporation (ITT). On August 31, 1972, Chairman Casey of the Commission wrote Senator Kennedy as follows:

> The Commission has, as your letter points out, initiated and settled civil actions involving some of the transactions under investigation. However, the staff informs me that it is still investigating other collateral matters which might lead to further appropriate proceedings.
>
> In such investigations the Commission has been likened to a grand jury and like a grand jury it is the Commission's policy to conduct its investigations on a confidential basis. Accordingly, in order to protect the contents of its investigatory files and the integrity of its investigative procedures, the Commission refrains from giving out material from its pending investigations. Pursuant to this established procedure, it is the Commission's decision to respectfully refuse your request.[95]

On September 21, 1972, Chairman Staggers of the Special Subcommittee on Investigations of the House Committee on Interstate and Foreign Commerce made a similar request for Commission documents concerning its investigation of ITT. On September 26, 1972, Chairman Casey responded:

> It is the general policy of this Commission not to make public or deliver to any other party, materials, records and documents,

---

[94] *Executive Privilege. The Withholding of Information by the Executive: Hearing on S 1125 Before the Subcomm. on Separation of Powers of the Senate Comm on the Judiciary,* 92d Cong., 1st Sess. 403 (1971).

[95] *Legislative Oversight of SEC: Inquiry into Withholding and Transfer of Agency Files Pertaining to ITT · Hearing Before the Special Subcomm. on Investigations of the House Comm. on Interstate and Foreign Commerce,* 92d Cong., 2d Sess 29–30 (1972).

during the course of this kind of an investigation and for a very good reason. Any investigation might lead to referral by the Commission of its investigative files to the Department of Justice with a recommendation for criminal prosecution. In such cases, the Commission has the same obligation as a grand jury to protect possible defendants from being unfairly injured by the possibility of a damaging but not fully substantiated charge. As you know, the Courts have strictly construed the right of a defendant to be free from pre-trial publicity. We do not want to take the chance that our release of any material obtained pursuant to our subpoena issued for the purpose of enforcing securities law would impair the rights of possible defendants or render ineffective any action taken to enforce the law. I am sure that you can understand our need to keep this file inviolate at this time.[96]

Chairman Staggers reiterated his demand for access to the ITT investigative file in a letter to Chairman Casey on September 28, 1972, in which he stated, "the Commission's sudden refusal . . . is most strange and unprecedented."[97] On October 6, 1972, Chairman Casey wrote Chairman Staggers as follows:

I must . . . correct [your] statement that the Commission's position on this matter is unprecedented. Our basic policy was clearly set forth in the December 17, 1969 letter which former [SEC] Chairman Budge sent to the [House] Committee on Government Operations. Chairman Budge expressed the Commission's position on the availability of data from pending investigations in the following language:

"The Commission has consistently taken the position, however, and has generally persuaded interested Congressional committees that, barring exceptional circumstances, it is inappropriate for Congressional committees to be furnished nonpublic information pertaining to a pending investigation or Commission adjudication. The Commission has adopted this position . . . to maintain the appearance as well as the fact of agency impartiality in its adjudicatory functions and to avoid any impediment to its investigatory and enforcement function."

\*          \*          \*          \*          \*

The considerations which Chairman Budge stressed are particularly vital in a matter [like this one] which can attract wide publicity and speculation. . . . I believe it to be a misuse of our subpoena power to permit access to documents except for the enforcement purposes for which it was authorized, a failure in our obligation to avoid anything which could jeopardize an enforce-

---

96 *Id.* at 6.
97 *Id.* at 7.

ment action, and an impropriety in disposing of documents, which may be used as evidence in a prosecution, in any matter which could cut off any rights a possible defendant might want to assert with respect to them in relation to any party other than the Commission.[98]

## 23. *1973*

On November 28, 1972, Chairman Magnuson of the Senate Committee on Commerce requested access to files of the Securities and Exchange Commission relating to certain unspecified investigations disclosed in a "computer name and relation" printout previously supplied by the Commission to the Committee, which was investigating the effects of organized criminal activity on legitimate commerce. On January 10, 1973, Chairman Casey of the Commission responded to Senator Magnuson as follows:

> [T]he Commission has directed the staff to make available to your Committee for inspection at our offices any Commission files you request as long as to do so would not violate the policies established to meet our law enforcement responsibilities. As you recognize in your letter, this would mean excluding all current investigative files. It would also exclude those files relating to cases referred to the Department of Justice for criminal prosecution. We must also exclude any reference to or information received from confidential sources.[99]

The long and consistent history reflected in this and our December 14, 1982, Memorandum of actions by Executive Branch and independent agency officials to protect the integrity of confidential information from unwarranted disclosures to Congress, places in perspective similar necessary actions taken during this Administration. The separation of powers principle which underlies the structure of our government has brought virtually every Administration to the same conclusion: that some information at certain times not only may, but must, be withheld from the Legislative Branch in order that the laws may be faithfully executed.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[98] *Id.* at 8.
[99] *Id.* at 108